## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Louise D., | |
| Plaintiff, | Civil No. 3:22-cv-01465-MPS |
| v. | |
| Martin O'Malley,[1] Commissioner of Social Security, | February 29, 2024 |
| Defendant. | |

## RECOMMENDED RULING ON PENDING MOTIONS

The Plaintiff, Louise D.,[2] appeals the decision of the Commissioner of Social Security ("Commissioner" or "Defendant"), rejecting her application for Disability Insurance ("DI") benefits under Title II of the Social Security Act. (Compl., ECF No. 1.) She seeks an order reversing the Commissioner's decision and remanding her case "for an award and calculation of benefits," or "for a *de novo* hearing." (Pl.'s Memo. of L. in Support of Pl.'s Mot. To Reverse the Decision of the Comm'r, ECF No. 16-2, at 26) ("Pl.'s Memo."). The Commissioner has moved for an order affirming the decision. (Def.'s Mot. for an Order Affirming the Decision of the Comm'r, ECF No. 19.) Chief United States District Judge Michael P. Shea referred the case to

---

[1]    When she filed her complaint, the Plaintiff named the then-acting Commissioner of Social Security, Kilolo Kijakazi, as the defendant. (ECF No. 1, at 1.) Since then, President Biden nominated and the Senate confirmed Martin O'Malley as the Commissioner. Commissioner O'Malley is automatically substituted as the defendant pursuant to Fed. R. Civ. P. 25(d). The Clerk of the Court is respectfully directed to amend the caption of the case accordingly.

[2]    Pursuant to the Court's January 8, 2021 Standing Order, the Plaintiff will be identified solely by first name and last initial, or as "the Plaintiff," throughout this opinion. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

me, United States Magistrate Judge Thomas O. Farrish, "for all purposes including issuing a Recommended Ruling" on any dispositive motions.  (ECF No. 12.)

The Plaintiff claims that the Administrative Law Judge ("ALJ") made three principal errors in deciding her case.  First, she says that "the treating physician rule was not followed" in this pre-March, 2017 case.  (Pl.'s Memo., at 1-12.)  Second, she claims that her "impairments were inadequately evaluated," principally because the ALJ did not "grasp[] the severity of the functional impairments caused by [her] executive function disorder" and did not "adequately consider [her] physical impairments."  (*Id.* at 12-18.)  Third, she argues that "the ALJ's Step Five findings [were] unsupported," in part because he lacked a sufficient basis for his conclusions about her physical capabilities.  (*Id.* at 18-23.)  The Commissioner responds that "substantial evidence supports the ALJ's findings and the ALJ applied the correct legal standards."  (Memo. in Supp. Of Def.'s Mot. For an Order Affirming the Comm'r's Decision, ECF No. 19-1, at 1) ("Def.'s Memo.").

Having carefully reviewed the parties' submissions, and having carefully reviewed the entire, 2,189-page administrative record, the Court agrees with the Commissioner.  Because this is a Title II case, the Plaintiff bore the burden to prove that she was disabled prior to her date last insured ("DLI"), March 31, 2015.  The ALJ concluded that she had not met that burden, and his conclusion is supported by substantial evidence and free from legal error.  I will therefore recommend that the District Judge deny the Plaintiff's Motion to Reverse (ECF No. 16) and grant the Commissioner's Motion to Affirm.  (ECF No. 19.)

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff is a (now) sixty-three-year-old woman from Waterbury, Connecticut who formerly worked as a customer service specialist for a manufacturing company.  (R. 213-14.)  In 2014 she began exhibiting strange behaviors, and she began to fall without explanation.  She went

to the Waterbury Hospital emergency room at least four times before someone thought to order a CT scan of her head.  (R. 314-15.)  When doctors performed that scan on August 29, 2014, they discovered a "large, bifrontal . . . intracranial mass" – in other words, a brain tumor.  (R. 315.)

The Plaintiff had the tumor removed at Yale New Haven Hospital on September 3, 2014. (R. 394-95.)  The hospital discharged her on September 7, 2014.  (R. 412.)  At her first post-operative outpatient appointment, the Plaintiff was "notably anxious with regards to her progress." (R. 416.)  But her neurosurgeon reassured her that, although she had "one of the largest tumors we have seen," she had done "quite well following surgery."  (R. 417.)  The doctor conducted a physical exam, during which the Plaintiff "move[d] all extremities with 5/5 strength."  (R. 416.) "[H]appy with her progress," the doctor scheduled her to come back in three months.  (R. 417.)

The Plaintiff treated with several different health care providers in September and October of 2014.  Complaining of "[a]nxiety symptoms" and "[p]anic attacks," she went to see a Licensed Clinical Social Worker ("LCSW") named Marta Maresco on September 26, 2014.  (R. 660-61.) She also began treating with a new primary care physician, Dr. Nahida Khan, on October 6, 2014. (R. 599-602.)  On October 21, 2014, she underwent a psychiatric evaluation by Dr. Sunil Saxena. (R. 664-65.)

The Plaintiff applied for DI benefits with the Social Security administration ("SSA" or "Administration") on October 22, 2014.  (R. 79.)  She claimed to have been disabled by her brain tumor, and she alleged a disability onset date of June 30, 2014.  (*Id.*)  After it obtained her medical records, the SSA referred her file for review by a physician, Dr. Virginia Rittner, and a psychologist, Dr. Pamela Fadakar.  (R. 79-88.)  Dr. Rittner observed "objective neuro[logical] exams [within normal limits]," and concluded that a "medical[] durational denial is appropriate based on objective evidence in [the] file."  (R. 85.)  Dr. Fadakar concluded that although the

Plaintiff suffered from a medically determinable affective disorder, the resulting impairment was not severe because it did "not significantly limit physical or mental ability to do basic work activities." (R. 86-87.) A disability claims examiner then determined that the Plaintiff was "not disabled." (R. 87.) She wrote that although the Plaintiff's tumor was severe, "it has improved and did not keep [her] from working for 12 months in a row." (R. 88.) The examiner added that the Plaintiff's "condition was not disabling on any date through 3/31/2015, when [she] w[as] last insured for disability benefits." (*Id.*)

The Plaintiff requested reconsideration (R. 107), and the SSA referred her file to Tarun Ray, M.D., and Susan Uber, Ph.D. (R. 97-98.) Dr. Ray read the medical records as indicating that the "Claimant was coming along quite well," and that any neurological issues "would be non severe 12 months from the date of surgery." (R. 97.) The doctor noted an allegation of "severe memory loss," but wrote that it "could not be confirmed by the available" medical evidence of record. (*Id.*) Dr. Uber joined Dr. Fadakar in assessing the Plaintiff with a medically determinable affective disorder, but she concluded that the disorder led to only mild limitations in mental functioning. (R. 98.) With these opinions in the file, the reconsideration disability examiner found the Plaintiff "[n]ot [d]isabled," because her "condition did not result in significant limitations in [her] ability to perform basic work activities on or before" the DLI. (R. 99.)

The Plaintiff then requested a hearing before an ALJ (R. 114-15), and ALJ John Aletta held a hearing on August 8, 2017. (R. 38.) On September 1, 2017, he issued a thirteen-page decision holding that the Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from June 30, 2014, the alleged onset date, through March 31, 2015, the date last insured." (R. 19-31.) The Plaintiff then requested review by the Appeals Council (R. 172), but the Council denied her request. (R. 1.) She therefore appealed to this Court (*see* Compl., ECF No. 1, 3:19-cv-

00067 (AVC)), and the SSA answered her complaint by filing the administrative record. (ECF No. 11, No. 3:19-cv-00067 (AVC)). After reviewing the record, however, the SSA evidently reconsidered its position, because it consented to have the case remanded for further proceedings. (ECF No. 19, No. 3:19-cv-00067 (AVC)). Upon remand, the Appeals Council instructed the ALJ to conduct additional analysis of the Plaintiff's claimed mental impairments; attempt to obtain a full copy of an opinion from Dr. Khan, only a fragment of which had yet made it into the file; and consider whether another hearing was warranted. (R. 1150-52.)

Before the second hearing, the SSA obtained additional medical evidence. Relevant here, the Administration obtained a letter from Dr. Joseph Trettel, a Hartford neuropsychiatrist with whom the Plaintiff had begun treating in 2016. (R. 1387.) In an earlier letter, Dr. Trettel had opined that the Plaintiff "suffers from cognitive impairments including executive dysfunction, slow processing speed, memory difficulty, and visuospatial deficits." (R. 924) (letter of Apr. 3, 2017). In the new letter, dated October 26, 2017, Dr. Trettel elaborated that the Plaintiff had developed "a striking and severe behavioral syndrome consistent with damage to both frontal lobes" of the brain. (R. 1387.) He stated that the Plaintiff's then "current clinical presentation is dominated by impulsivity, perseveration of thought, inability to weigh consequences of actions, severely impaired judgment, short-term memory deficits and very severe impairments in executive functions." (*Id.*) He provided his "medical opinion" that "*in no way is this individual able to maintain employment*," and he contended that "these *changes began immediatly* [sic] *after the tumor resection and were not present prior*, implicating a *causative relationship between the resection and her symptoms.*" (*Id.*) (emphases in original).

The ALJ held a second hearing on July 12, 2022 (R. 1078), and on August 5, 2022 he issued a twenty-three page decision. (R. 1045-67.) As will be discussed below, ALJs are required

to follow a five-step sequential process in evaluating Social Security disability claims, and the ALJ's written decision followed that format.  At Step One, he concluded that the Plaintiff had not engaged "in substantial gainful activity during the period from her alleged onset date of June 30, 2014 through her date last insured of March 31, 2015."  (R. 1048.)  At Step Two, he determined that the Plaintiff suffered from the severe impairments of "brain tumor – status – post resection," "optic neuropathy," "arcuate field of vision defect," "mood disorder," "bipolar disorder," and "major depressive disorder."  (R. 1048.)  He considered the Plaintiff's hypopituitarism, but he concluded that it was not a medically determinable impairment because the record did not contain "objective testing" confirming it as such.  (*Id.*)  He also considered "mild cognitive disorder," "neurocognitive disorder," "anxiety," "obsessive-compulsive disorder," "degenerative disc disease of the cervical spine," and "encephalopathy," but he held that they were likewise not medically determinable as of the DLI, "because these diagnoses were made after the claimant's date last insured and the record does not contain objective evidence confirming those impairments as medically determinable impairments before the claimant's date last insured."  (*Id.*)

At Step Three of the five-step process, the ALJ concluded that the severity of the Plaintiff's impairments did not meet or medically equal any of the "Listings" – that is, the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 1048-50.)  He then considered the Plaintiff's residual functional capacity, or "RFC," and determined that:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  She can engage in reading activities for up to 4 hours during each 8 hour work day.  She can perform simple, routine tasks and can recall and execute short, uninvolved instruction.  She can tolerate occasional, brief interaction with the general public.  She can tolerate occasional, minor changes in her work setting and work procedures.  She can set simple, routine work plans.

(R. 1050.)  At Step Four, he concluded that the Plaintiff could not have returned to her past relevant work during the period between her alleged disability onset date and her DLI.  (R. 1065.)  At Step

Five, however, he relied on the testimony of a vocational expert and held that the Plaintiff could have performed other "jobs that existed in significant numbers in the national economy." (R. 1065.) He summed up by holding, as he had after the first hearing, that "[t]he claimant was not under a disability, as defined in the Social Security Act, at any time from June 30, 2014, the alleged onset date, through March 31, 2015, the date last insured." (R. 1066.)

Bypassing the Appeals Council,[3] the Plaintiff appealed the ALJ's second decision to this court. (Compl., ECF No. 1.) Shortly after she did so, Judge Shea referred the case to me "for all purposes including issuing a Recommended Ruling" on any dispositive motions. (ECF No. 12.) The Commissioner subsequently answered the complaint by filing a certified copy of the 2,189-page administrative record. (ECF No. 13; *see also* D. Conn. Standing Scheduling Order for Social Security Cases, ECF No. 5, at 2 (stating that the Commissioner's filing of the administrative record is "deemed an Answer (general denial) to Plaintiff's Complaint").) The Plaintiff then filed her motion for an order reversing or remanding the Commissioner's decision (ECF No. 16), supported by a twenty-six page brief (ECF No. 16-2), and by a twenty-one page statement of material facts. (ECF No. 16-1.) The Commissioner replied with a motion to affirm (ECF No. 19), also supported by a substantial brief and statement of facts. (ECF Nos. 19-1, 19-2.) The Plaintiff  did not file a

---

[3]     Ordinarily a plaintiff must appeal an adverse decision of an SSA ALJ to the Appeals Council, and if she does not, the federal courts lack jurisdiction over her claim. *See* 42 U.S.C. § 405(g) (providing that a claimant may appeal to the federal court only when there has been a "final decision of the Commissioner of Social Security made after a hearing to which he was a party"); *Sims v. Apfel*, 530 U.S. 103, 107 (2000) ("If a claimant fails to request review from the [Appeals] Council, there is no final decision and, as a result, no judicial review in most cases."). But there is an exception to this principle where, as here, "a case is remanded by a Federal court for further consideration and the Appeals Council remands the case to an" ALJ.  20 C.F.R. §§ 404.984(a), -416.1484(a).  In that situation, the ALJ's remand decision "will become the final decision of the Commissioner . . . unless the Appeals Council assumes jurisdiction of the case" on its own motion. *Id.*; *see also Lax v. Astrue*, 489 F.3d 1080, 1082 (10th Cir. 2007) ("Because the Appeals Council remanded Lax's case to an ALJ after the federal court's initial remand, the ALJ's decision stands as the final decision of the Commissioner for purposes of our review.").

reply brief, and her time for doing so has expired.  The parties' motions are therefore ripe for decision.

## II.  APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'"  *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)); *see also* 20 C.F.R. § 416.905(a).  As noted above, SSA ALJs follow a familiar five-step evaluation process in determining whether a claimant is disabled.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity."  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)).  To be found non-disabled at this step, the claimant must be performing work that is "both substantial and gainful," with "substantial" defined in the SSA regulations as "work activity that involves doing significant physical or mental activities," and "gainful" defined as work done "for pay or profit."  20 C.F.R. § 404.1572.

At Step Two, the ALJ considers the claimant's "medically determinable impairments" and analyzes whether one or more are "severe."  *McIntyre*, 758 F.3d at 150.  While the regulations governing Step Two do not contain an express definition of "severe," they do define "non-severe impairment[s]," and thus they define severity by negative implication.  *Larkin v. Astrue*, No. 3:12-cv-0035 (WIG), 2013 WL 4647243, at *5 (D. Conn. Apr. 29, 2013), *report and recommendation adopted in part, rejected in part on other grounds,* No. 3:12-cv-35 (MPS), 2013 WL 4647229 (D. Conn. Aug. 29, 2013).  "An impairment or combination of impairments is not severe if it does not

significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522(a), -416.922(a); *see also* SSR 96–3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996). Impairments that are "not severe" must be only a slight abnormality that has no more than a minimal effect on an individual's ability to perform basic work activities. *Id.* at *1.

At Step Three, the ALJ evaluates whether the claimant's impairment "meets or equals the severity" of one of the "Listings." *McIntyre*, 758 F.3d at 150. At that step, the ALJ considers the severity of the impairment, without regard to vocational factors. *See* 20 C.F.R. §§ 404.1525(a), -416.925(a) (describing Listings as "impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience"). "A claimant who satisfies a Listing at Step Three is entitled to benefits, and the evaluation of his claim ends there." *Kujtim M. v. Kijakazi*, No. 3:21-cv-205 (TOF), 2022 WL 2965621, at *3 (D. Conn. July 27, 2022). Listed impairments are purposefully set at a high level of severity because "the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).

If the claimant is not found disabled at Step Three, the ALJ then assesses her RFC and uses that assessment at Step Four to determine whether she can perform any of her "past relevant work." A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545. The regulations oblige the SSA to assess RFC "based on all the relevant evidence in [the claimant's] case record," *id.,* and they define "past relevant work" as "work that [the claimant has done] within the past 15 years, that was substantial gainful activity, and that lasted long enough for [claimant] to learn to do it." 20 C.F.R. § 404.1560. Taken together, the definitions of RFC and "past relevant work" require the ALJ to consider, at Step Four, whether the claimant has the

functional ability despite her limitations to perform substantial gainful work that she did within the prior fifteen years.

If the claimant cannot do her past relevant work, the ALJ proceeds to Step Five and considers whether "there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience." *McIntyre*, 758 F.3d at 150 (citing *Burgess*, 537 F.3d at 120)). "An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing the testimony of a vocational expert." *Id.* at 151. "If the ALJ chooses the latter route, she 'may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumption upon which the vocational expert based his opinion.'" *Peter B. v. Kijakazi*, No. 3:20-cv-966 (TOF), 2022 WL 951689, at *11 (D. Conn. Mar. 30, 2022) (quoting *McIntyre*, 758 F.3d at 150). The claimant bears the burden of proving her case at Steps One through Four. *Id.* At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

When a claimant seeks a disability determination in connection with an application for Title II DI benefits, as opposed to Title XVI Supplemental Security Income benefits, the disability must exist within the claimant's period of insurance. As the Second Circuit has explained, "[t]o be eligible for disability insurance benefits, an applicant must be 'insured for disability insurance benefits.'" *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (quoting 42 U.S.C. §§ 423(a)(1)(A), -(c)(1)). "Once a person gains fully insured status – as defined in 42 U.S.C. § 414 – a person is 'insured for disability insurance benefits in any month if . . . [s]he had not less than 20 quarters of coverage during the 40-quarter period which ends with the quarter in which such month occurred.'" *Mauro v. Berryhill*, 270 F. Supp. 3d 754, 761 (S.D.N.Y. 2017) (quoting 42 U.S.C. §

423(c)(1)). "Where . . . a claimant does not apply for benefits before his date last insured, he may still obtain benefits if he has been under a continuous period of disability that began when he was eligible to receive benefits." *Perrone v. Saul*, No. 3:17-cv-125 (RNC), 2019 WL 4744820, at *1 n.2 (D. Conn. Sept. 30, 2019) (brackets and citation omitted). "Nonetheless, no matter how disabled a claimant is at the time of his application or hearing, he is only entitled to the benefits of the Act if he is able to prove disability existed prior to his date last insured." *King v. Colvin*, No. 14-cv-829S, 2016 WL 1165309, at *3 (W.D.N.Y. Mar. 25, 2016) (citation omitted). "When a claimant does not show that a currently existing condition rendered him disabled prior to his date last insured, benefits must be denied." *Kavanaugh v. Saul*, No. 3:18-cv-1521 (MPS), 2020 WL 1181436, at *1 n.1 (D. Conn. Mar. 12, 2020) (quoting *Mauro*, 270 F. Supp. 3d at 762) (brackets omitted).

In reviewing a final decision of the Commissioner, this Court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). Its role is to determine whether the Commissioner's decision is supported by substantial evidence and free from legal error. "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner. *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (citations omitted). Although the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (quotation marks and citations omitted). When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment. "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

An ALJ does not receive the same deference if he has made a material legal error. In other words, district courts do not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## III.    DISCUSSION

As noted above, the Plaintiff makes three principal claims of error. First, she argues that "the 'treating physician rule' was not followed" in this pre-March, 2017 case. (Pl.'s Memo., at 1-12.) Second, she says that her "impairments were inadequately evaluated." (*Id.* at 12-18.) Third, she contends that "the ALJ's Step Five findings [were] unsupported," particularly with respect to her physical impairments. (*Id.* at 18-21.) I will address each claim of error in turn.

### A.    First Claim of Error – The "Treating Physician Rule"

The "treating physician rule" applies to claims filed before March 27, 2017. 20 C.F.R. § 404.1527; *Schillo v. Kijakazi*, 31 F.4th 64, 70 (2d Cir. 2022). When adjudicating claims made before that date, "[t]he SSA recognizes a 'treating physician' rule of deference to the views of the

physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). "According to this rule, the opinion of the Plaintiff's treating physician as to the nature and severity of the impairments is given 'controlling weight' so long as it 'is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'" *Poole v Saul*, 462 F. Supp. 3d 137, 149 (D. Conn. 2020) (quoting *Burgess*, 537 F.3d at 128). If the opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques, then the opinion is not entitled to controlling weight. 20 C.F.R. §§ 404.1527(c)(2).

"[I]f the ALJ decides the opinion is not entitled to controlling weight, [he] must determine how much weight, if any, to give it." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). In making this determination, the ALJ ordinarily must "explicitly" consider at least four factors, commonly referred to as the "*Burgess*" factors after one of the cases in which they were articulated. *Id.* at 95-96. The four factors are: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Id.* (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) and citing *Burgess*, 537 F.3d at 129) (brackets omitted); *see also* 20 C.F.R. § 404.1527(c)(2). "At both steps" – that is, when determining whether the opinion is entitled to controlling weight and, if not, what weight to give it – "the ALJ must 'give good reasons in [his] notice of determination or decision for the weight [he] gives the treating source's medical opinion.'" *Id.* at 96 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)).

While an ALJ's failure to explicitly consider all four *Burgess* factors frequently constitutes a reversible procedural error, "courts will often excuse that error if 'a searching review of the

record' confirms 'that the substance of the treating physician rule was not traversed.'" *Dawn Lyn C. v. Kijakazi*, No. 3:20-cv-545 (TOF), 2021 WL 4398372, at \*9 (D. Conn. Sept. 27, 2021) (quoting *Estrella*, 925 F.3d at 95-96). In *Stonick v. Saul*, for example, an ALJ accorded little weight to a treating orthopedist's opinion that the claimant could sit or walk for no more than an hour at a time. 2020 WL 6129339, at \*6. She did not explicitly reference the *Burgess* factors, but this Court nevertheless affirmed her decision, because the record was replete with objective medical evidence confirming that the claimant was not so limited. *Id.* at \*6-7. "Though the ALJ did not explicitly consider the *Burgess* factors when reviewing [the orthopedist's] medical source opinions, a 'searching review' of the record shows that her decision was supported by 'good reasons' and that 'the substance of the treating physician rule was not traversed.'" *Id.* at \*7 (quoting *Estrella*, 925 F.3d at 96); *see also Lori A.K. v. Comm'r of Soc. Sec.*, No. 3:22-cv-118 (TOF), 2023 WL 2607637, at \*6-7 (D. Conn. Mar. 23, 2023) (holding that a failure to explicitly address all the *Burgess* factors could be excused where there "was nothing, anywhere," in the doctor's records "supporting the claimed limitations" in his opinion).

In this case, the Plaintiff argues that the ALJ should have accorded "treating source opinion" status to six pieces of information, and that he mishandled each one. The six are: (1) Dr. Trettel's April 3, 2017 statement (R. 924); (2) Dr. Trettel's October 26, 2017 opinion (R. 1387); (3) a September 14, 2020 "mental capacity statement" from a psychiatrist, Dr. Maria Patrascu (R. 1817-23); (4) a June 8, 2022 "mental capacity statement" from Dr. Patrascu and her colleague, LCSW Christine Melfi (R. 2164-67); (5) the partial medical source statement from Dr. Khan dated December 29, 2014 (R. 1389-92); and (6) a January 20, 2015 statement from Dr. Saxena. (R. 1392-97.)

I will discuss each of the six below, but before doing so, I will pause to address one other argument raised by the Plaintiff. Under the heading "the 'treating physician rule' was not followed," the Plaintiff makes a cursory attack on the ALJ's decision to accord "significant weight" to the reports of two of the four non-treating state agency consultants, Drs. Rittner and Ray. (Pl.'s Memo., at 2-3.) The two doctors observed "that the claimant's brain tumor had been successfully removed," and they opined that she "did not have a physical impairment meeting the one year durational requirement for severity." (R. 1061.) The ALJ gave these opinions "significant weight," but he also noted that the tumor had pressed on the Plaintiff's optic nerve, leading to reading limitations that the doctors had not assessed. (*Id.*) ("However, the record . . . shows that as a result of the claimant's brain tumor pressing on her optic nerve, and its surgical removal, the claimant is limited to engaging in reading activities for up to 4 hours during an 8 hour workday."). The ALJ therefore disagreed with the two doctors in the Plaintiff's favor, but the Plaintiff nonetheless says that he erred in ascribing "significant weight" to their opinions. (Pl.'s Memo., at 2.) She does not explain exactly what was wrong with the opinions; rather, she says only that it was error to rely so heavily on a physician who had not "such much as laid eyes on [her] let alone examined her." (*Id.*)

This sort of blanket attack on the use of non-examining state agency consultants is contradicted by established law. "It is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions." *Suarez v. Colvin*, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) (collecting cases); *see also Rosier v. Colvin*, 586 F. App'x. 756, 758 (2d Cir. 2014) (summary order) (substantial evidence supporting ALJ's conclusion that a treating physician's opinion should not be given controlling weight included evaluations by a consultative examiner). Of course, "[c]ourts in this Circuit long have casted doubt on assigning significant

weight to the opinions of consultative examiners when those opinions are based solely on a review of the record." *Soto v. Comm'r of Soc. Sec.*, No. 19-cv-4631 (PKC), 2020 WL 5820566, at *7 (E.D.N.Y. Sept. 30, 2020). But if the opinions have proper support in the record, "[a]n ALJ is entitled to rely on the opinions of both examining and non-examining State agency medical consultants, because those consultants are deemed to be qualified experts in the field of social security disability." *Wilson v. Saul*, No. 3:18-cv-01097 (WWE), 2019 WL 2603221, at *11 (D. Conn. June 25, 2019). In this case, the doctors' opinion that the Plaintiff's tumor had resolved without lingering severe impairments was sufficiently supported by the record, as will be discussed in Section III.A.1 below.

With this argument addressed, I will turn to the gravamen of the Plaintiff's first claim of error. She faults the ALJ for ascribing "little weight" to the two opinions from Dr. Trettel and the two mental capacity statements from Dr. Patrascu. (Pl.'s Memo., at 4-8.) She also says that he should have accorded different weight to "the incomplete medical source statement from" Dr. Khan. (*Id.* at 8-10.) And she says that the ALJ erred in discounting the opinion of Dr. Saxena as "internally inconsistent." (*Id.* at 10-12.) I will address each argument in turn.

### 1.    *Dr. Trettel*

As noted in Section I above, the administrative record contains two statements from Dr. Trettel, both written more than two years after the Plaintiff's DLI. In the first, the doctor wrote on April 3, 2017 that the Plaintiff "[c]urrently . . . suffers from cognitive impairments including executive dysfunction, slow processing speed, memory difficulty, and visuospatial defects." (R. 924.) He further noted that "[b]ehaviorally, she had an acquired obsessive-compulsive disorder, as well as impulsivity, and impaired judgment," and "[s]he struggles with some of her ADLs and IADLs." (*Id.*) He closed with his "medical opinion that this individual is disabled due to her

neurologic disorder." (*Id.*)  In this opinion, he said nothing specific about the Plaintiff's condition or limitations during the period between her alleged disability onset date and her DLI.  (*See id.*)

Dr. Trettel elaborated in his second statement on October 26, 2017.  (R. 1387.)  He explained that after the resection of her tumor, the Plaintiff "developed a striking and severe behavioral syndrome consistent with damage to both frontal lobes." (*Id.*)  Her then-current clinical presentation was "dominated by impulsivity, perseveration of thought, inability to weigh consequences of actions, severely impaired judgment, short-term memory deficits and very severe impairments in executive functions." (*Id.*)  The doctor offered his "medical opinion that *in no way is this individual able to maintain employment* due to the above-noted symptoms." (*Id.*) (emphasis in original).  And this time, he said more about the Plaintiff's condition during the relevant period: he stated that "these *changes began immediatly* [sic] *after the tumor resection and were not present prior*, implicating *a causative relationship between the resection and her symptoms.*" (*Id.*) (emphasis in original).

The ALJ gave the first opinion "little weight," and his explanation of his reasons for doing so was very brief.  (R. 1061.)  In an evident reference to Dr. Trettel's "medical opinion" that the Plaintiff "is disabled," the ALJ wrote that "[t]he question of the claimant's disability is an issue reserved for the Commissioner." (*Id.*)  The ALJ then added that "the claimant first treated with Dr. Trettel on August 11, 2016, which is long after the claimant's March 31, 2015 date last insured." (*Id.*)

The ALJ also gave the second opinion "little weight," and his discussion was similarly brief.  (R. 1061-62.)  In response to Dr. Trettel's "state[ment] that the claimant cannot maintain employment," the ALJ again noted that "[t]he question of the claimant's ability to work is an issue reserved to the Commissioner." (R. 1062.)  He then repeated that "the claimant first treated with

17

Dr. Trettel . . . on August 11, 2016, which is long after the claimant's" DLI.  (*Id.*)  He closed by stating that "[t]herefore, the basis for Dr. Trettel's conclusion is unclear."  (*Id.*)

On appeal, the Plaintiff challenges this assignment of "little weight" on two principal grounds.  First, she says that "the 'reserved to the Commissioner' argument is . . . a straw man," because a treating physician's statements about a claimant's employability should be regarded as "opinions concerning the severity of the claimant's condition."  (Pl.'s Memo., at 4 & n.8) (quoting *LeDonne v. Astrue*, No. 3:08-cv-1525 (PCD), slip op. at 13 (D. Conn. Jan. 12, 2010)).  Second, she argues that the ALJ should not have discounted the opinions on the ground that Dr. Trettel did not begin treating her until 2016, because "the bald rejection of a retrospectively issued opinion is improper."  (Pl.'s Memo., at 4-5.)

The Commissioner disagrees.  With respect to the portions of the opinions in which Dr. Trettel stated that the Plaintiff was "disabled" or "[un]able to maintain employment," he notes that these are not "medical opinions" in the contemplation of the SSA regulations and, therefore, are entitled to no deference.  (Def.'s Memo., at 13.)  More broadly, the Commissioner argues that Dr. Trettel's opinions are not entitled to deference under the treating physician rule because the rule "does not apply to opinions from sources who did not treat the claimant during the relevant period." (*Id.*) (citing, *inter alia*, *Ramsey v. Comm'r of Soc. Sec.*, 830 F. App'x 37, 39-40 (2d Cir. 2020) (summary order)).

The Court agrees with the Commissioner that the treating physician rule does not control the analysis of Dr. Trettel's opinions.  When a doctor does not treat the claimant "during the relevant period," "the treating physician rule does not apply."  *Campbell v. Astrue*, 596 F. Supp. 2d 446, 452 (D. Conn. 2009).  The Second Circuit case of *Arnone v. Bowen* explains why.  882 F.2d 34, 40-41 (2d Cir. 1989).  In that case, the plaintiff's claim depended on showing continuous

disability from 1977 to 1980.  *Id.*  He attempted to do so with an opinion from a doctor who had treated him in 1974, 1975, and 1987, but the Court of Appeals held that the doctor was not a "treating physician" within the meaning of the rule, because "there simply was no ongoing physician-treatment relationship between" the claimant and the doctor during the period relevant to the disability analysis.  *Id.* (internal citation omitted).  The doctor was therefore not in a "unique position to make a complete and accurate diagnosis," and accordingly the rationale undergirding the treating physician rule was not implicated.  *Id.*  In this case, as in *Arnone* and *Campbell*, the Plaintiff did not begin treating with the opining doctor during the relevant period.  (*See* R. 778) (report of "initial evaluation" dated August 11, 2016).  The treating physician rule therefore does not control.

Yet this does not mean that the ALJ could casually disregard all of Dr. Trettel's opinions.  While those opinions principally concerned the Plaintiff's condition in 2017 – a topic that is irrelevant here, *see Clark v. Saul*, 444 F. Supp. 3d 607, 621 (S.D.N.Y. 2020) (holding that the treating physician rule was not violated "[b]ecause none of the opinions from treating physicians relate to the relevant time period") – the second opinion does contain a retrospective element, if only in a single sentence.  (R. 1387) (stating that the Plaintiff's "cognitive and behavioral changes" "*began immediatly* [sic] *after the tumor resection*" in September, 2014) (emphasis in original).  And it is well established that retrospective opinions from treating physicians may not be disregarded simply because they are retrospective.  "A treating physician's retrospective medical assessment of a patient may be probative when based upon clinically acceptable diagnostic techniques."  *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996).  Thus, even if a doctor "did not treat [a] plaintiff during the period prior to plaintiff's date last insured, that fact alone does not show that [his] opinion warrants no consideration or weight."  *McAllister v. Colvin*, 205 F. Supp. 3d 314,

332 (E.D.N.Y. 2016).  Indeed, such an opinion can be entitled to "some, or even significant weight."  *Perrone*, 2019 WL 4744820, at *5 (quoting *Rogers v. Astrue*, 895 F. Supp. 2d 541, 549 (S.D.N.Y. 2012)).

In this case, the Plaintiff's attack on the ALJ's treatment of Dr. Trettel's retrospective opinion is not without some superficial appeal.  Viewed in isolation from the rest of his decision, the ALJ's terse discussion of the second Trettel opinion could be read as suggesting that he discounted it merely because it was retrospective, without analyzing whether it was the sort of retrospective opinion that is entitled to more than a "little" weight.  (R. 1062.)  And while the ALJ was not required to give controlling effect to Dr. Trettel's opinion on the ultimate issue of disability, *see* 20 C.F.R. § 404.1527(d) and *Taylor v. Barnhart*, 83 F. App'x 347, 349 (2d Cir. 2003) (summary order), he was not entitled to discount the rest of the opinion merely because it contained a few sentences in which the doctor went beyond his ken.  *See Cottrell v. Colvin*, 206 F. Supp. 3d 804, 809-10 (W.D.N.Y. 2016) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).  Moreover, in this section of his decision the ALJ did not expressly discuss topics commonly discussed when discounting a doctor's opinion, including the opinion's supportability and consistency and the physician's specialty.  *See Estrella*, 925 F.3d at 96.

Nevertheless, a holistic review of the entire ALJ opinion and a "searching review" of the entire administrative record leads to the ineluctable conclusion that the rules were not "traversed." *Id.*  In an earlier portion of his RFC analysis, the ALJ carefully reviewed the medical evidence from the relevant period (R. 1052-56), and that evidence provides a substantial – indeed, a persuasive – basis for discounting Dr. Trettel's retrospective opinion of disabling cognitive and behavioral impairments beginning "immediately after the tumor resection."  (R. 1387.)  As the ALJ noted, the Plaintiff's neurosurgeon stated that she was "doing quite well" as soon as her first

post-operative outpatient visit on September 19, 2014, with no observed behavioral issues other than "anxi[ety] with regards to her progress." (R. 1052, 416.) When the Plaintiff visited LCSW Marta Maresco a week later, she reported "[a]nxiety symptoms," "[p]anic attacks," and "[s]ymptoms of a depressive disorder" (R. 660), but the therapist nonetheless observed a "cooperative and attentive" patient with "no gross behavioral abnormalities," "normal" speech, "intact" language skills, and "fair" insight and judgment. (R. 661.) The following week the Plaintiff saw Dr. Khan, who documented "good judgment" and "normal mood and affect." (R. 601.) She then visited Dr. Saxena on October 21, 2014, and afterward the doctor reported that "[e]xamination of [the Plaintiff] reveals her to have no apparent serious mental status abnormalities." (R. 664.) At that visit her behavior was "generally appropriate," her thinking was "basically logical," and her "thought content [was] appropriate." (*Id.*)

The medical record from the late fall of 2014 is similar. The Plaintiff saw Dr. Saxena again on November 4, 2014, and the doctor again documented "no apparent serious mental status abnormalities," "logical" thinking, and "appropriate" thought content. (R. 668.) The Plaintiff then visited LCSW Maresco again on November 20, 2014, and reported that she was "doing well and would like to discuss stopping therapy in about a month." (R. 671.) She added that although her primary care physician had told her that the tumor's pressure on her frontal lobes might affect "her ability to inhibit behavior," she nevertheless felt that she was "in satisfactory control of her behavior." (*Id.*) The therapist agreed that the Plaintiff was "doing remarkably well," and added that she "seem[ed] to have great enjoyment for life." (*Id.*) After a December 9, 2014 visit, Dr. Saxena again documented "no apparent serious mental abnormalities," and recorded the Plaintiff as reporting "improve[ment]" in her decision making. (R. 672.)

The medical record continues in this vein from the beginning of 2015 to the DLI. To be sure, the Plaintiff told Dr. Khan on January 2, 2015 that her "impulse control" was slipping, as evidenced by an episode in which she "bought 27 pairs of underwear" on a single shopping trip. (R. 585.) But Dr. Khan nevertheless regarded her as "active and alert," assessed her as having "good judgement," and did not diagnose her with the executive function disorders that Dr. Trettel would later observe. (R. 587-88.) On January 20, 2015, Dr. Saxena saw the Plaintiff and reported that her "mental status ha[d] no gross abnormalities." (R. 674.) He added that her "dress and grooming [were] appropriate" and she was "friendly and communicative," with "no signs of depression or manic process." (*Id.*) He specifically addressed her "cognitive functioning," stating that it was "intact and age appropriate." (*Id.*) He made the same assessment after another visit on February 24, 2015, adding that the Plaintiff's "[j]udgment appear[ed] intact." (R. 676.) In his last medical report before the DLI, on March 17, 2015, Dr. Saxena again documented "no apparent serious mental abnormalities" and "no signs of cognitive difficulty." (R. 678.) All these medical records were referenced in the ALJ's opinion. (R. 1052-56.)

In short, a "searching review of the record" reveals that the rules governing the treatment of opinion evidence were "not traversed" in the case of Dr. Trettel's retrospective opinion. *Estrella*, 925 F.3d at 96. While the ALJ did not expressly discuss all four *Burgess* factors in the precise section of his opinion containing the weight assessment, it is clear from his exhaustive discussion in an earlier section that he understood "the amount of medical evidence supporting the opinion" and "the consistency of the opinion with the remaining medical evidence." (R. 1052-56); *Estrella*, 925 F.3d at 95-96. And it is equally clear that he understood "the frequency, length, nature, and extent of treatment" and the opining doctor's specialty, because he commented on both. *Id.*; (R. 1059, 1061-62.) Under these circumstances, he did not commit reversible error. *See*

*Schillo*, 31 F.4th at 78-79 (affirming ALJ's decision, notwithstanding failure to discuss all the *Burgess* factors, because "the ALJ nevertheless applied the substance of the treating physician rule" by "articulat[ing] 'good reasons'"); *Lori A.K.*, 2023 WL 2607637, at *7 (affirming ALJ's handling of a treating physician opinion because, although he "did not explicitly address all the *Burgess* factors," his discussion elsewhere in his decision revealed that he "clearly understood" the issue claimed as a basis for reversal); *Stonick*, 2020 WL 6129339, at *6 (affirming the Commissioner's decision because the Court's "searching review" of the record revealed abundant objective medical evidence confirming that the claimant was not as limited as the treating physician's opinion claimed). There was a substantial evidentiary basis for the conclusion that Dr. Trettel's retrospective opinion was entitled to "little weight."

### 2. *Dr. Patrascu and LSCW Melfi*

The Plaintiff next contends that the ALJ mishandled two medical source statements from Dr. Patrascu, one of which was co-signed by LCSW Melfi. In the first statement, dated September 14, 2020, Dr. Patrascu rated the Plaintiff as a "Category IV" in virtually every dimension of mental functioning, meaning that she could not perform in that dimension "for 15% or more of an 8-hour work day." (R. 1817-23.) The doctor added that the Plaintiff would have to be "off task" for more than thirty percent of each workday, and that she would likely be absent from work "5 days or more" of each month "as a result of her physical and/or mental impairments and/or her need for ongoing and periodic medical treatment and care for them." (R. 1819.) In the second statement, dated June 8, 2022, she and LCSW Melfi essentially repeated these conclusions. (R. 2164-67.)

The ALJ gave both statements "little weight." With respect to the first, he noted that it did not even purport to be retroactive to the DLI; rather, it only "asserted that the claimant had the opined limitations since January 1, 2016." (R. 1064.) He then observed that Dr. Patrascu "did not

begin treating the claimant until April 4, 2019," "which is 4 years after the claimant's date last insured." (*Id.*) He added that "the opined limitations are not supported by the medical evidence of record prior to the date last insured or anytime near the date last insured," for the reasons he had previously cited. (*Id.*) The ALJ cited essentially the same reasons for according "little weight" to the second opinion. (R. 1065.)

On appeal, the Plaintiff claims that this was error, but her argument is underdeveloped. (Pl.'s Memo., at 7.) It principally consists of a single paragraph, in which she merely recapitulates the ALJ's holding and directs the Court to the case of *Holt v. Colvin*, No. 3:16-cv-1971 (VLB), 2018 WL 1293095 (D. Conn. Mar. 13, 2018). (*Id.*) An accompanying footnote adds a one-sentence argument that the Patrascu/Melfi statements were "fully consistent with" clinical findings that Dr. Saxena had made during the relevant period. (*Id.* at 7 n.15.) Later, the Plaintiff adds a single sentence urging the Court to find reversible error in the fact that the record does not document "some intervening factor (such as an acute closed head trauma)" between the DLI and the dates of the two statements. (*Id.* at 8.)

The Court disagrees that the ALJ committed reversible error in his handling of the two statements. To begin with, the treating physician rule does not apply to the Patrascu/Melfi opinions, because neither practitioner treated the Plaintiff during the relevant period. *Campbell*, 596 F. Supp. 2d at 452; *see also* discussion, Section III.A.1 *supra*. Moreover, the ALJ was correct in observing that neither statement even purports to be retroactive to the DLI. The first statement asserts that the Plaintiff's allegedly disabling "impairments, symptoms and limitations" have lasted only "since January 1, 2016" (R. 1817), and the second relates back only to January 1, 2017. (R. 2164.) For "records to provide substantial evidence of a disability during the relevant time period, the records must actually[] shed light on [the claimant's] condition during that period[,]" *Clark*, 444

F. Supp. 3d at 621, and the Patrascu/Melfi statements do not.  Finally, substantial evidence supports the ALJ's conclusion that "the opined limitations are not supported by the medical evidence of record prior to the date last insured or anytime near the date last insured" (R. 1064), notwithstanding the Plaintiff's argument that they were "fully consistent" with Dr. Saxena's findings.  (Pl.'s Memo., at 7 n.15.)  As noted above, Dr. Saxena repeatedly assessed the Plaintiff with "no apparent serious mental status abnormalities" on several occasions before the DLI.  (R. 664, 668, 672; *see also* R. 674 ("no gross abnormalities").)

*Holt* does not compel a different result.  In the passage cited by the Plaintiff, Judge Bryant faulted an ALJ for deciding a case without any medical "assessments of the claimant's functional limitations," and without having "request[ed] a medical source statement from a treating physician."  (Pl.'s Memo., at 7 n.15) (citing the *Holt* slip op. at 18-20); *Holt*, 2018 WL 1293095, at *7-8.  That was not the case here, because the record contained extensive information on the Plaintiff's functional abilities in the areas referenced by Dr. Patrascu and LCSW Melfi, including medical source statements.  (*E.g.,* R. 664, 668, 672, 674, 1389-92, 1393-97.)  In sum, the ALJ's decision to ascribe "little weight" to the Patrascu/Melfi opinions was free of legal error and supported by substantial evidence.

### 3.    Dr. Khan

The Plaintiff next challenges the ALJ's treatment of a January 2, 2015 opinion from Dr. Khan.  (Pl.'s Memo., at 8-10; *see also* R. 1389-92.)  The doctor had given the Plaintiff a Montreal Cognitive Assessment, or "MoCA test," and she recorded a score of 25 out of 30.[4]  (R. 1389.)  She

---

[4]    The Montreal Cognitive Assessment, or "MoCA test," "is a brief, 30-question test that helps healthcare professionals detect cognitive impairments very early on, allowing for faster diagnosis and patient care."  MoCA Cognition, *The MoCA Test*, *available at* mocacognition.com (last visited February 29, 2024).  A score of between 18 and 25 may indicate a "mild cognitive impairment," while a score of between 10 and 17 may indicate a "moderate cognitive impairment."

also described the Plaintiff as "short term memory impaired," and she recorded that the Plaintiff was "speaking very quickly" and that her "thought content" was "obsessive compulsive." Importantly, however, she then scored the Plaintiff as having "[b]etter than average," "[m]uch better than average," or "[e]xcellent" functional ability in every rated dimension of activities of daily living, social interaction, or task performance.  (R. 1390-91.)

The ALJ assigned only "partial weight" to this opinion, and the Plaintiff claims this was reversible error.  (Pl.'s Memo., at 8-10.)  She evidently contends that the ALJ should have given more weight to those portions of the opinion that suggested a disabling impairment, and less weight to those portions that did not.  She suggests that the ALJ would have assigned more weight to the former if he had considered that she had been prescribed powerful antidepressants like amitriptyline and trazodone, and powerful pain relievers like oxycodone and tramadol.  (*Id.* at 8-9.)  And she contends that he would have assigned less weight to the latter if he had considered that Dr. Khan had not meaningfully evaluated "the functional aspects of [her] mental impairments" before January 2, 2015.  (*Id.* at 9) (noting that Dr. Khan's pre-January, 2015 "[a]ssessment/[p]lan" revolved around insomnia and low back pain, and asking "[h]ow examination/treatment for *any* of these conditions could underpin" the January 2, 2015 assessment of functional ability).  In other words, she argues that if the ALJ had engaged more deeply with the opinion and its context, he would have put more weight on things like the low MoCA score and the assessment of "impaired short term memory," and less weight on the findings of "[b]etter than average," "[m]uch better than average," and "[e]xcellent" functional abilities.  (R. 1062, 1389-92.)

---

*Id.*  The authors of the test caution, however, that "research for these severity ranges has not been established yet."  *Id.* at FAQ page.

The Commissioner responds that the ALJ considered the *Burgess* factors and therefore must be affirmed.  (*See* Def.'s Memo., at 12.)  As a legal matter, the Commissioner is correct that if an ALJ properly considers those factors and gives "good reasons" for assigning less than controlling weight to a treating physician's opinion, the Court should affirm even if it might have viewed the evidence differently.  *See, e.g., Patricia Christine K. v. Acting Comm'r of Soc. Sec.*, No. 1:21-cv-762 (JJM), 2023 WL 6225247, at *8 (W.D.N.Y. Sept. 26, 2023) (citing *Snell*, 177 F.3d at 133).  And he is factually correct that the ALJ did expressly consider the second, third, and fourth *Burgess* factors.  The ALJ discussed "the amount of medical evidence supporting the opinion" when, among other things, he pointed out that the doctor "did not provide details" of the MoCA testing.[5]  (R. 1062.)  He discussed the "consistency of the opinion with the remaining medical evidence" when he observed that the finding of "impaired short-term memory" is "inconsistent" with the other portions documenting "excellent ability . . . [in] carrying out multistep instructions," and he discussed "whether the physician is a specialist" when he noted that Dr. Khan was the Plaintiff's primary care doctor.  (*Id*.)  Whether the ALJ properly considered the first *Burgess* factor of "the frequency, length, nature, and extent of treatment" in assigning weight to Dr. Khan's opinion is less clear; he discussed it elsewhere in his decision (R. 1053-55), but he did not explicitly address it in the paragraphs containing the weight assessment.

Yet even if this was a procedural error, the ALJ's treatment of the opinion would still merit affirmation because the treating physician rule was not traversed.  As the Second Circuit has explained, the "substance" of the rule is not "traversed" when, notwithstanding a failure to expressly address all four *Burgess* factors, "the record otherwise provides 'good reasons' for

---

[5]    The Plaintiff claims that this was an "absurd[]" statement (Pl.'s Memo., at 8), but the Court does not see how this is so.  The simple fact is that Dr. Khan provided only a raw score, with no underlying data.  (R. 1389, 585-88.)

assigning 'little weight'" to a treating source opinion. *Estrella*, 925 F.3d at 96. A "slavish recitation of each and every factor" is not required "where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order). Here, the ALJ clearly reasoned that, although Dr. Khan had observed "impaired short term memory" and a low MoCA score, it had not yet affected the Plaintiff's functional abilities because the doctor scored her as "[b]etter than average," "[m]uch better than average," or "[e]xcellent" in every functional dimension. (R. 1062, 1389-92.)

In a way, the Plaintiff is arguing that the ALJ should have done precisely what an ALJ should *not* do. "Because ALJs are not doctors, they ordinarily cannot translate diagnoses, medical test results and the like into functional, vocational terms without the aid of a medical provider's insight into how the claimant's impairments affect or do not affect her ability to work, or her ability to undertake her daily activities of life." *Robles v. Saul*, No. 3:19-cv-01329 (TOF), 2020 WL 5405877, at *4 (D. Conn. Sept. 9, 2020) (quoting *Guillen v. Berryhill*, 697 F. App'x 108, 109 (2d Cir. 2017) (summary order)) (quotation marks and brackets omitted). The Plaintiff says, in substance, that the ALJ should have translated the MoCA score and drug prescriptions into functional terms himself, and that he should have placed less emphasis on the doctor's statement of her functional abilities. But this is not what an ALJ should ordinarily do.

The Plaintiff next argues that the ALJ failed to develop the record with respect to Dr. Khan's opinion (Pl.'s Memo., at 9-10), but the Court disagrees. The SSA sent a six-page form to the doctor, and her opinions are found on pages three through six. (R. 1389-92.) Pages one and two are missing from the administrative record, if indeed the doctor ever completed them. (*See id.*) On appeal, the Plaintiff contends that the ALJ impermissibly attempted to "out-source the task" of finding the missing pages to her attorney. (Pl.'s Memo., at 9-10 & n.20.) But this

misstates the record, because the SSA did attempt to obtain the complete document on its own. (R. 1465.)

Moreover, the Plaintiff has not shown that the gap created by the allegedly missing pages constitutes a reversible error. To obtain reversal on account of a missing medical record, a claimant "must show that [s]he was harmed by the alleged inadequacy of the record." *Santiago v. Astrue*, No. 3:10-cv-00937 (CFD), 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) (citing *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996)). "To demonstrate such harm, a plaintiff 'must show that the additional medical reports would undermine the ALJ's decision' . . . because 'mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand.'" *Jennifer Lynn E. v. Kijakazi*, No. 3:20-cv-00695 (TOF), 2021 WL 4472702, at *6 (D. Conn. Sept. 30, 2021) (quoting *Lena v. Astrue*, No. 3:10-cv-00893 (SRU), 2012 WL 171305, at *9 (D. Conn. Jan. 20, 2012) (brackets omitted)). Here, the Plaintiff has come forward with no reason to suppose that the missing page would have changed the result.

### 4.    *Dr. Saxena*

The Plaintiff next contends that the ALJ erred in ascribing "little weight" to Dr. Saxena's January 20, 2015 statement. (Pl.'s Memo., at 10.) In that statement, the doctor rated the Plaintiff at least "average" in every dimension of mental functioning. (R. 1395-96.) He also rated her as "[b]etter than average" in her ability to carry out activities of daily living such as "[u]sing good judgment" and "[u]sing appropriate coping skills." (R. 1395.) Curiously, however, he gave her an overall score of "frequently a problem, or limited ability" in overall mental functioning. (R. 1395.) To use an analogy, his opinion reads like a high school report card in which the student got a B or C on every test yet received a D for the course.

The ALJ noted this inconsistency.  He walked through the functional dimensions in which the Plaintiff had received an "average" or "better-than-average" rating.  (R. 1063.)  He noted, "however," that "Dr. Saxena circled category 2 for frequently a problem/limited ability on the rating scale."  (*Id.*)  He then concluded that, "[b]ased on the circling of category 2, while not rating any of the specific categories below average . . . this opinion is internally inconsistent and given little weight."  (*Id.*)

On appeal, the Plaintiff claims that this was error.  (Pl.'s Memo., at 10-11.)  Her argument is underdeveloped, and essentially amounts to a claim that an ALJ always owes unbounded deference to the treating physician.  (*Id.* at 11) ("The medical professionals are in the position to make clinical evaluations as to [her] abilities on a function-by-function basis, not the ALJ," and "those evaluations are entitled to deference.").  She acknowledges that an ALJ can accord less-than-controlling weight to a treating physician opinion if he specifically addresses the *Burgess* factors, but she contends that "[i]t cannot be said that the factors . . . were explicitly applied in the case at [b]ar."  (*Id.* at 12.)

The Court disagrees.  The ALJ addressed the first *Burgess* factor when he noted that Dr. Saxena had been treating the Plaintiff monthly for only three-and-a-half months at the time of the opinion.  (R. 1063) (noting that the doctor saw the Plaintiff "monthly from October 21, 2014 through January 20, 2015").  He discussed the second and third factors of supportability and consistency when he noted that the overall grade of "category 2" was neither supported by nor consistent with the doctor's individualized determinations of each dimension of mental functioning.  (*Id.*)  And he discussed whether the opining physician is a specialist when he noted that Dr. Saxena was a "treating psychiatrist."  (*Id.*)  Moreover, the ALJ's conclusion that the opinion was "inconsistent" is supported by substantial evidence because there is an obvious

inconsistency between an overall grade of "2" on the one hand, and grades of "4" or "5" in each component dimension on the other hand. Where the ALJ properly considers the *Burgess* factors in assigning less-than-controlling weight to a treating physician's opinion, and where he cites "good reasons" for doing so that are supported by substantial evidence, the Court is constrained to affirm his decision. *Patricia Christine K.*, 2023 WL 6225247, at *8 (citing *Snell*, 177 F.3d at 133).

Finally, the Plaintiff notes that "[t]he ALJ took no steps whatsoever to seek clarification or additional information from Dr. Saxena." (Pl.'s Memo., at 7 n.16.) If this was an attempt to argue that the ALJ failed in his duty to develop the record with respect to the Saxena opinion, the Court declines to address it because it was raised only in a single sentence in a footnote. (*Id.*); *see also Dayle B. v. Saul*, No. 3:20-cv-00359 (TOF), 2021 WL 1660702, at *10 n.8 (D. Conn. Apr. 28, 2021) (quoting *Skibniewski v. Comm'r of Soc. Sec.*, No. 19-cv-00506, 2020 WL 5425343, at *3 n.1 (W.D.N.Y. Sept. 10, 2020) for the proposition that "[c]ourts in this circuit have made clear that arguments in footnotes are waived."). In summary, the Plaintiff has identified no reversible error or failure of substantial evidentiary support in the ALJ's handling of the opinion evidence.

### B.    Second Claim of Error – Inadequate Evaluation of Impairments

The Plaintiff's second claim of error is an argument that her "impairments were inadequately evaluated." (Pl.'s Memo., at 12-18.) She cites four impairments in particular. First, she says that she has executive function disorder, and she argues that "the ALJ does not appear to have grasped the severity of the functional impairments caused by" the disorder. (*Id.* at 13.) Second, she says that the ALJ did not properly evaluate her degenerative disc disease of the cervical spine. (*Id.* at 16.) Third, she contends that "[b]ack pain has also been a consistent feature of [her] presentation" since before her brain surgery, and fourth, she notes that she was once "evaluated for 'chronic knee pain bilaterally.'" (*Id.* at 17.) The ALJ did not recognize any of these

impairments as medically determinable, let alone as severe (R. 1048), and accordingly the Plaintiff's challenge is fundamentally a claim of Step Two error.

The Plaintiff bore the burden to prove her claimed impairments with medical evidence. Until March 2017, 20 C.F.R. § 404.1508 provided that "[a] physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings." The regulation went on to say that an impairment could not be proven "only by [the claimant's] statement of symptoms" *Id.* Under Section 1508, when a claimed impairment is unsupported by a medical diagnosis or other medical evidence – and, in particular, when it is supported only by the claimant's own testimony – an ALJ does not err in concluding that the impairment is not medically determinable. *See, e.g., Rahni v. Saul*, No. 3:18-cv-00754 (KAD), 2019 WL 6039980, at *3 (D. Conn. Nov. 14, 2019) (affirming ALJ's determination that plaintiff's claimed carpal tunnel syndrome was not medically determinable, where it was unsupported by a formal diagnosis or other "objective medical evidence").

In this case, there is no diagnosis or other objective medical evidence of the four claimed impairments prior to the DLI. With respect to the first of the four, the record does not document impaired executive function until November 22, 2016 (R. 774), and it does not contain a diagnosis of executive function disorder until Dr. Trettel's second opinion on October 26, 2017, if indeed that opinion constituted a diagnosis. (R. 1387.) In her brief the Plaintiff recapitulates her own testimony about her executive functions, and she says that it supports the existence of the disorder before the DLI, but it is well established that a claimant cannot prove an impairment solely through her own statement of symptoms. *See* 20 C.F.R. § 404.1508 (effective to Mar. 26, 2017); 20 C.F.R. §404.1528(a) (effective to Mar. 26, 2017) ("Your statements alone are not enough to establish that there is a physical or mental impairment."). With respect to the second claimed impairment of

cervical disc disease, the Plaintiff cites a medical report from May 31, 2016 and an MRI report from July 20, 2017 (Pl.'s Memo., at 16), but these documents post-date the DLI by a year and two years, respectively. She argues that because her disc disease is degenerative, the ALJ should have inferred that it existed before the DLI (*id.*), but the ALJ was under no duty to speculate in the absence of "medical evidence consisting of signs, symptoms, and laboratory findings." 20 C.F.R. § 404.1508 (effective to Mar. 26, 2017). With respect to the third claimed impairment, while the Plaintiff did occasionally complain of back pain before the DLI (*e.g.*, R. 588), the record does not document any impairment from that condition. As the Commissioner points out, the pre-DLI record repeatedly documents normal functioning and ambulation (*e.g.*, R. 598, 601), and the last pre-DLI physical therapy report confirms that her lumbar spine range of motion was then within normal limits. (R. 1441.) Finally, the fourth claimed impairment of knee pain is supported only by an April 11, 2017 medical report, more than two years after the DLI. (Pl.'s Memo., at 17) (citing R. 943-47). In that report the Plaintiff claimed to have had knee pain "since brain surgery for tumor in 2014" (R. 943), but again, her own statements of her symptoms do not prove an impairment under the then-existing version of 20 C.F.R. §§ 404.1508, -404.1528(a) (effective to Mar. 26, 2017). Because none of the medical evidence supporting the four allegedly mis-evaluated impairments predates the DLI, the Plaintiff's second claim of error should be rejected.

### C.    Third Claim of Error – Unsupported Step Five Findings

The Plaintiff's third and final claim of error flows from the second. She argues that because the ALJ allegedly mis-evaluated her neck, back, and knee impairments beginning at Step Two, he also erred in the formulation of the RFC when he concluded that she could "perform 'a full range of work at all exertional levels.'" (Pl.'s Memo., at 18-19.) She then says that, because he overestimated her physical capabilities when he formulated the RFC, he also erred at Step Five

when he determined that she could perform work that was available in the national economy. (*Id.*) She adds that if he had limited her to light work, a person of her age and education would have been "*prima facie* disabled by operation of the Medical-Vocational Guidelines," or "Grids." (*Id.*)

This argument is unpersuasive. As Judge Dooley has explained, "the Plaintiff has the burden to prove a more restrictive RFC than the ALJ found." *Gibson v. Saul*, No. 3:20-cv-00145 (KAD), 2021 WL 371577, at *11 (D. Conn. Feb. 3, 2021) (quoting *Salerno v. Berryhill*, No. 19-cv-00627 (KHP), 2020 WL 882006, at *10 (S.D.N.Y. Feb. 24, 2020)). Although the Commissioner bears a burden at Step Five, the burden shift is only a "limited" one; while the Commissioner must "show that there is work in the national economy that the claimant can do[,] he need not provide additional evidence of the claimant's residual functional capacity." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). Where the ALJ approaches Step Five by adducing testimony from a vocational expert, rather than by applying the Medical Vocational Guidelines, he may ask the expert hypothetical questions "as long as 'there is substantial evidence to support the assumption[s] upon which the vocational expert based his opinion' . . . and accurately reflect the limitations and capabilities of the claimant involved." *McIntyre*, 758 F.3d at 151 (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553-53 (2d Cir. 1983)). Taking all these principles together, an ALJ can ask a hypothetical based on an RFC with no exertional restrictions – and can reasonably rely on the vocational expert's answer – if there is substantial evidence for that RFC, and the claimant has not met her burden to prove anything more restrictive.

That is what happened in this case. Based on an extensive and fully developed record, he ALJ reasonably concluded that the Plaintiff had not met her burden to show physical impairments other than those he listed in his Step Two determination as of the DLI. (R. 1048; *see also* discussion, Section III.B *supra*.) He then properly developed an RFC that did not contain any

exertional limitations arising out of those unproven claims of impairment. (R. 1050.) Finally, he posed hypothetical questions to a vocational expert that were not inconsistent with that RFC,[6] and he reasonably relied on the expert's answers. (R. 1109-11, 1066.) There is no error. *See Gibson*, 2021 WL 371577, at \*12 (rejecting claim that ALJ erred at Step Five by not including a claimed limitation in his hypothetical, where there was a sound basis for not including it).

## IV.    CONCLUSION

For the foregoing reasons, I recommend that the District Judge deny the Plaintiff's Motion to Reverse (ECF No. 16), grant the Commissioner's Motion to Affirm (ECF No. 19), enter judgment in favor of the Commissioner, and close the case.

This is a recommended ruling by a United States Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen days of being served with it. *See* Fed. R. Civ. P. 72(b)(2). Failure to object within fourteen days will preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; D. Conn. L. Civ. R. 72.2; *Impala v. United States Dep't of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (stating that failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

*/s/ Thomas O. Farrish*
_____
Hon. Thomas O. Farrish
United States Magistrate Judge

---

[6]    In fact, the hypothetical was even more restrictive than the RFC. While the ALJ ultimately (and reasonably) found that the Plaintiff was able to perform work at all exertional levels prior to the DLI, his hypotheticals asked about job opportunities for persons who could do only medium work. (R. 1109-11.) Thus, he reasonably found that there was a sufficient number of jobs available in the national economy for someone even more limited than he ultimately determined the Plaintiff to be.